UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---

| | |
|---|---|
| DCD NUCAR ALNI LLC, individually and as successor by merger to DCD NUCAR ALCD LLC, and DCD RE PLAZA LANE LLC, Plaintiffs, | : |
| v. | : No. 5:25-cv-4327 |
| ROTHROCK MOTOR SALES, INC., DAVID B. ROTHROCK, individually and on behalf of THE ESTATE OF BRUCE L. ROTHROCK, SR., BRUCE L. ROTHROCK, JR, DEAN A. ROTHROCK, ROCK REAL ESTATE HOLDINGS, LLC, and ROCK REAL ESTATE FAMILY PARTNERS, LP, Defendants. | : |

---

**O P I N I O N**
**Defendants' Motion to Dismiss the Complaint, ECF No. 20 – Granted and Denied in Part**

**Joseph F. Leeson, Jr.**                                    **December 8, 2025**
**United States District Judge**

## I.    INTRODUCTION

Plaintiffs DCD Nucar Alni LLC and DCD RE Plaza Lane LLC filed the instant suit

against Defendants Rothrock Motor Sales, Inc., David B. Rothrock, Bruce L. Rothrock, Jr., Dean

A. Rothrock, Rock Real Estate Holdings, LLC, and Rock Real Estate Family Partners, LP,

alleging breach of contract, fraud, rescission, and indemnification, arising from the sale of two

Lehigh County automobile dealerships. The Complaint alleges that the Defendants intentionally

misrepresented the financial performance of the dealerships to the Plaintiffs, who then purchased

the dealerships under false pretenses and suffered unanticipated expenses and financial losses as

a result. Defendants now move to dismiss the Complaint in its entirety. For the following

reasons, the Motion will be granted in part and denied in part.

## II.     BACKGROUND

### A.  Factual Allegations

For years, Daniel and Christopher Dagesse[1] were successful operators of more than thirty automotive dealerships in states other than Pennsylvania. Compl., ECF No. 1, at ¶¶ 14, 19. Rothrock Motor Sales, Inc. ("Rothrock") had been operating car dealerships in Pennsylvania since the 1960s. *Id.* at ¶ 16. In early October 2023, the Dagesses were approached by a broker about the sale of two automobile dealerships in Allentown, Pennsylvania (the "Dealerships"), *id.* at ¶ 14, which were owned by Rothrock, *id.* at ¶ 3. On October 23, 2023, the broker provided Daniel Dagesse with a pitch deck containing financial information about the Dealerships (the "Pitch Deck"). *Id.* at ¶ 15. The Pitch Deck "contained specific revenue, expense, and net profit figures for the Dealerships, combined, for the years 2020 through the third quarter of 2023," *id.* at ¶ 20, and detailed "Profit Performance" for the Dealerships, including three years of adjusted profit figures, *id.* at ¶ 22, represented as follows: $1,055,636 in 2020; $2,153,545 in 2021; $1,616,019 in 2022; and $1,153,830 YTD (9 months) or $1,538,452 (annualized) in 2023, *id.* at ¶ 23. The Pitch Deck also contained information on "Pack Adjustments,"[2] defined as follows:

> In the automotive industry, a "pack" is a predetermined expense added by a dealer to the invoice price of a vehicle that is intended to account for overhead expenses such as rent, advertising, and vehicle reconditioning, and it reduces the revenue generated by the vehicle before a salesperson's commission is calculated. Most dealerships, including those operated by Rothrock, utilize multiple "packs." Pack monies are also taken into income by a dealership and customarily "earned" and effective at the time a vehicle is sold.

---

[1]      Christopher Dagesse is a member of DCD Nucar Alni LLC, which is the successor by merger to DCD Nucar ALCD LLC. Compl., ECF No. 1, at ¶ 1. Prior to the merger, DCD Nucar Alni LLC and DCD Nucar ALCD LLC were the purchasers of the Dealerships at issue in this case. *Id.*

[2]      "The Pitch Deck also showed that Rothrock characterized a significant fraction of the Dealerships' annual net profits as 'Add-Backs,' and that by far the largest 'Add-Back' component in every year was a 'Pack Adjustment.'" *Id.* at ¶ 21.

Compl. at ¶ 24.

"[A]fter reviewing the information the Pitch Deck conveyed, Plaintiffs decided that the Dealerships presented a potentially attractive opportunity." *Id.* at ¶ 26 (emphasis omitted). When Plaintiffs inquired as to how Defendants took pack monies into income, the broker responded, "Seller's W2 and or dealership income on the 13th month stmt…." *Id.* at ¶ 27. Plaintiffs understood the "13th month" to be "an accounting concept in the automotive industry to record year-end items" (like adjustments), *id.* at ¶ 27 n.1, and interpreted the broker's response as indication that "the adjusted revenue and income figures supplied did *not* include the pack monies in income," *id.* at ¶ 27 (emphasis in Compl.). Satisfied with Defendants' representations of the Dealerships' income, Plaintiffs entered into an Asset Purchase Agreement for the assets of the Dealerships (the "APA"), and a Purchase and Sale Agreement for the real estate upon which the Dealerships operate (the "PSA").[3] *Id.* at ¶ 28. The APA and PSA were "finalized and executed" on January 29, 2024. *Id.* at ¶ 29.

Between January and April of 2024, Plaintiffs asked Defendants for more clarification regarding the financial information in the Pitch Deck, namely about Rothrock's treatment of pack monies. *Id.* at ¶ 32. On or about February 9, 2024, Defendants gave Plaintiffs access to certain financial data which "appeared to [Plaintiffs] to be consistent with the Pitch Deck." *Id.* at ¶ 34. On or about February 13, 2024, Defendants provided Plaintiffs with an "Inventory Pack Listing" which detailed "all the pack monies that Rothrock utilized and how and where they were reflected in the Dealerships' financial statements." *Id.* at ¶ 35. On February 18, 2024, when

---

[3]     The "purchase of the real estate under the [PSA] was expressly contingent on the parties simultaneously closing on the Dealerships under the APA." *Id.* at ¶ 30.

Plaintiffs asked about a particular $1,500,000 pack adjustment in the financial statements they received, David Rothrock responded:

> These amounts are added to the cost of the vehicles and set up as liabilities on the balance sheet in the previously indicated accounts. The pack adjustments add back represents the unused portion of these packs that are remaining on the balance sheet. These amounts are then adjusted into income in the 13th month each year for tax reporting purposes.

Compl. at ¶ 36. Over the coming weeks, David Rothrock "repeatedly told [Plaintiffs] both orally and in writing, that the pack monies must be added back to adjusted net income figures provided to Nucar to understand the 'true' income and profit of the Dealerships." *Id.* at ¶ 37. On February 27, 2024, Defendants provided Plaintiffs with a spreadsheet titled "Vehicle Packs," which "detailed all vehicle packs that Rothrock had used since 2022 and the amounts set for each as specific line items." *Id.* at ¶ 38. It indicated that the pack monies were not reflected in income on monthly financial statements, but were rather "taken into income in a 13th month statement." *Id.* on March 11, 2024, David Rothrock confirmed that Plaintiffs needed to add the pack monies to the adjusted net income data for fiscal year 2022 to have an accurate picture of the Dealerships' income for 2022. *Id.* at ¶ 39. Plaintiffs took this to be confirmation of the fact that pack monies were not reflected in the Dealerships' income, but rather, were only accounted for in the 13th month financial statements. *Id.*

The sale of the Dealerships' assets and real estate property, pursuant to the APA and PSA, closed on May 1, 2024. *Id.* at ¶ 40. At closing, Defendants delivered to Plaintiffs a signed Certificate of its representations and warranties that stated:

> "[a]ll representations and warranties of Seller contained in Section 8 of the Agreement were true and correct in all material respects when made, are true and correct in all material respects on and as of the date hereof as if made as to the date hereof (except in each case for those representations and warranties which address matters only as of a particular date, which representations and warranties are true and correct in all material respects as of such particular date)."

4
120825

Compl. at ¶ 40. After closing, Plaintiffs noticed that the Dealerships' profits were significantly less than expected, when compared to the projected data from Defendants. *Id.* at ¶ 41. Plaintiffs looked into the general ledger entries for a period not included in the pre-closing financials, and discovered that Defendants had not only included pack monies in their monthly income calculations (rather than including them only in the 13th month calculation), but had done so in the revenue figures supplied to Plaintiffs pre-closing. *Id.* at ¶ 42. Plaintiffs hired an accounting firm to conduct a forensic review of the Dealerships' financials, which revealed "that the financial records supplied to [Plaintiffs] prior to the closing of the APA and [PSA] . . . in fact already accounted for the majority of pack monies in the Dealership's income for all years under consideration during due diligence, 2020-2024," *id.* at ¶¶ 43-44, resulting in "material overstatements of the Dealerships' income for the operational years under examination," *id.* at ¶ 46. Since purchasing the Dealerships and related real estate, Plaintiffs report financial losses of several million dollars. *Id.* at ¶ 48.

### B.  Provisions in the APA[4]

The APA contains the following representations and warranties of Defendants:

---

[4]    The Court has been provided with a copy of the Asset Purchase Agreement ("APA"), appended as Exhibit 1 to Defendants' Motion to Dismiss. *See* APA, ECF No. 20-4. Plaintiffs reference the APA in the Complaint by name and execution date, and make numerous citations to provisions in the APA which can be verified by reference to Defendants' Exhibit 1. *See id.* There is no dispute between the parties regarding whether this document, ECF No. 20-4, is an authentic copy of the APA on which both sides' arguments explicitly rely. Accordingly, this Court finds that Plaintiffs have incorporated by reference the full text of the APA into their Complaint. This Court may consider the provisions of the APA in deciding the Rule 12(b)(6) motion before it, as such is in accordance with the applicable standard of review. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider . . . undisputedly authentic documents if the complainant's claims are based upon these documents."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] document integral to or explicitly relied upon in the complaint may be considered.") (internal quotations and italicization omitted).

**8. REPRESENTATIONS AND WARRANTIES OF SELLER**. Seller makes the following representations and warranties to Buyer in order to induce Buyer to enter into and consummate this Agreement as contemplated herein and Seller hereby represents and warrants the following to be true on the Effective Date and as of the Closing Date:

[...]

**8.23. Disclosures**. No representation or warranty or other statement made by Seller in this Agreement, nor any written statement, schedule or exhibit furnished or to be furnished by or on behalf of Seller pursuant to this Agreement, nor any document or certificate delivered to Buyer pursuant to this Agreement, contains or shall contain any untrue statement of a material fact or omits or shall omit to state a material fact necessary to make the statements contained therein not misleading.

Compl. at ¶ 31 (quoting APA, ECF No. 20-4, §§ 8; 8.23). The APA also contains

the following language in its indemnification provision:

**17.1. Obligation to Indemnify by Seller and Seller Related Entities**. From and after the Closing Date, Seller and each Seller Related party, jointly and severally, shall each indemnify, defend and hold harmless Buyer from and against any and all claims, losses, damages, debts, obligations and liabilities, including reasonable attorneys' fees and disbursements (collectively, "Losses"), based upon, incurred in connection with, arising out of or otherwise in respect of any of the following (i) any false or inaccuracy or misrepresentation, breach or failure of, any representation or warranty of Seller or any Seller Related Party contained in this Agreement or any Seller Closing Document, or in any certificate, exhibit, schedule or document delivered by Seller or any Seller Related Party pursuant to this Agreement[.]

[...]

**17.3. Losses**. The term "Losses" as used herein (i) is not limited to matters asserted by third parties against Seller or Buyer, but includes losses incurred or sustained by such parties in the absence of third-party claims, and (ii) includes losses incurred through and after the date of the claim for indemnification (including any losses suffered after the end of any applicable survival period, with respect to any such claim). Payments by Buyer of amounts for which Buyer is indemnified hereunder, and payments by Seller of amounts for which Seller is indemnified hereunder, shall not be a condition precedent to recovery.

Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss Plaintiffs'

Complaint (Pl. Br.), ECF No. 22, at 6 (citing APA §§ 17.1, 17.3).[5]

The APA also features the following integration clause:

> **30. <u>ENTIRE AGREEMENT</u>**. This Agreement together with the EXHIBITS and SCHEDULES annexed hereto (which are incorporated herein by this reference) and the documents delivered pursuant hereto, are intended by the parties as a final expression of their understanding and/or a complete and exclusive statement of the terms and conditions concerning the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether written or oral, of the parties; and there are no representations, warranties, or other agreements between the parties in connection with the subject matter hereof, except as specifically set forth herein or therein.

APA § 30.

## C. Procedural History

On July 30, 2025, Plaintiffs DCD Nucar Alni LLC and DCD RE Plaza Lane LLC filed a

Complaint in this Court against Defendants Rothrock Motor Sales, Inc., David B. Rothrock,

Bruce L. Rothrock, Jr., Dean A. Rothrock, Rock Real Estate Holdings, LLC, and Rock Real

Estate Family Partners, LP, alleging claims of rescission, breach of contract, indemnification,

fraudulent misrepresentation, fraudulent concealment, and fraudulent nondisclosure. *See* Compl.

Plaintiffs assert that Defendants intentionally misrepresented their treatment of pack monies to

deceive Plaintiffs into placing a higher value on the Dealerships and the connected real estate,

thereby inducing Plaintiffs to agree to the sale. *Id.* at ¶¶ 45, 47-48.

On August 25, 2025, Defendants filed a Motion to Dismiss the Complaint pursuant to

Fed. R. Civ. P. 12(b)(6). *See* Motion, ECF No. 20; *see also* Memorandum of Law in Support of

Defendants' Motion to Dismiss (Def. Br.), ECF No. 20-3. On September 5, 2025, Plaintiffs filed

---

[5]    The page numbers used in reference to Plaintiffs' Brief shall refer to the page numbers assigned by Plaintiffs' counsel on the document itself and featured at the bottom of each page, not the page numbering assigned by the ECF docketing system.

a Brief in Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint. *See* Pl. Br. On

September 12, 2025, Defendants filed a Reply Brief in Support of Defendants' Motion to

Dismiss. *See* Reply Br., ECF No. 24. The Court is now ready to render a decision on the Motion.

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss under Rule 12(b)(6) – Review of Applicable Law

Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe

the complaint in the light most favorable to the plaintiff." *Phillips v. County of Allegheny*, 515

F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d

Cir. 2002)) (internal quotation marks omitted). Only if "the '[f]actual allegations . . . raise a right

to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). However, "the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions." *Id.* at 678-79 (further explaining that determining

"whether a complaint states a plausible claim for relief . . . [is] a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense"). "In deciding

a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the

complaint, matters of public record, as well as undisputedly authentic documents if the

complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230

(3d Cir. 2010). Also, "a document integral to or explicitly relied upon in the complaint may be

considered." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)

(internal quotations and italicization omitted). The defendant bears the burden of demonstrating

that a plaintiff has failed to state a claim upon which relief can be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

### B.      Breach of Contract

A successful breach of contract claim requires that a plaintiff establish three things: (1) the existence of a contract; (2) a breach of duty imposed by the contract; and (3) the plaintiff suffered damages as a result of the breach. *See Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002). "To satisfy the first element—the existence of a contract itself—a party must plead enough facts to demonstrate (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *Abdul-Rahman v. Chase Home Finance Co., LLC*, No. 13-cv-5320, 2014 WL 3408564, at *2 (E.D. Pa. July 11, 2014) (cleaned up). "It is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." *Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298 (3d Cir. 1986).

### C.      Fraudulent Misrepresentation, Concealment, or Nondisclosure

Fraud arises where there is a "misrepresentation [that] is knowingly false, where there is an intentional concealment calculated to deceive, or where there is a nonprivileged failure to disclose." *Benevento v. Life USA Holding, Inc.*, 61 F. Supp. 2d 407, 421 (E.D. Pa. 1999) (citing *Smith v. Renaut*, 564 A.2d 188, 192 (Pa. Super. Ct. 1989)). A fraud claim in Pennsylvania consists of six elements: (1) the defendant made a misrepresentation or concealment; (2) "[w]hich [was] material to the transaction at hand;" (3) the misrepresentation or concealment was "[m]ade with knowledge of its falsity" or reckless disregard for the truth, or the concealment

was "calculated to deceive"; (4) the defendant intended to "mislead[] another into relying on it;" (5) the plaintiff "[j]ustifiabl[ly] reli[ed] on the misrepresentation" or concealment; and (6) the plaintiff's injury was proximately caused by that reliance. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 205 (3d Cir. 2022) (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 n.12 (Pa. 1994); *Youndt v. First Nat'l Bank of Port Allegany*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005)). Under Pennsylvania law, plaintiffs alleging different types of fraud must prove these elements at base, and may also have additional proof requirements.

For example, "a claim for fraudulent inducement requires proof of the six elements and is available when a person under no duty to enter a contract was deceived into doing so." *Id.* at 206 (citing *College Watercolor Grp., Inc. v. William H. Newbauer, Inc.*, 360 A.2d 200, 206 (Pa. 1976) and Justin Sweet, *Promissory Fraud and the Parol Evidence Rule*, 49 Calif. L. Rev. 877, 888 (1961) ("Fraud in the inducement occurs when one party, by means of false statements of fact, warranties, or promises, misleads another into contracting.")). A claim for fraudulent concealment requires proving the six elements of fraud and the existence of "a special relationship that would give rise to a duty to speak between them and the party that fraudulently concealed information." *Marcum v. Columbia Gas Transmission, LLC.*, 423 F. Supp. 3d 115, 121 (E.D. Pa. 2019). A claim for fraudulent nondisclosure requires proving the six elements of fraud and the existence of a duty on the part of one party to exercise reasonable care to disclose the matter to the other. *See Youndt*, 868 A.2d at 550.[6]

---

[6]    Some courts applying Pennsylvania law have suggested that fraudulent "concealment" and fraudulent "non-disclosure" are merely different classifications for the same type of fraud. *See, e.g., City of Rome v. Glanton*, 958 F. Supp. 1026, 1038 (E.D. Pa. 1997) (using both terms interchangeably), *aff'd sub nom. City of Rome, Italy v. Glanton*, 133 F.3d 909 (3d Cir. 1997).

Additionally, under the Federal Rules of Civil Procedure there is a heightened pleading standard for fraud, as required by Rule 9(b), which provides that "a party must state *with particularity* the circumstances constituting fraud[.]"  Fed. R. Civ. P. 9(b) (emphasis added). Consequently, it is necessary to "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation . . . and must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Hlista v. Safeguard Props., LLC*, 649 F. App'x 217, 221 (3d Cir. 2016) (internal citations omitted). The purpose of the heightened standard "is to provide a defendant with notice of the precise misconduct with which he or she is charged and to prevent false or unsubstantiated charges."  *Whitaker v. Herr Foods, Inc*., 198 F. Supp. 3d 476, 485 (E.D. Pa. 2016) (internal quotation and citations omitted).

## IV.    DISCUSSION

### A.    Breach of Contract

To survive a motion to dismiss, Plaintiffs' breach of contract claim must establish the existence of a contract, the breach of a duty imposed by the contract, and damages suffered as a result of the breach. *See Gorski*, 812 A.2d at 692. Here, Plaintiffs allege that they entered into a contract (the APA) with Defendants to purchase the assets of the Dealerships. Compl. at ¶ 57. The APA is an express contract; it was finalized and executed on January 29, 2024. *Id.* at ¶ 29. Neither side argues that the terms of the APA were indefinite or ambiguous, or that it lacked consideration, and Defendants concede that "the Complaint alleges that the APA is a valid

contract." Def. Br. at 18.[7] Thus, the Court finds that Plaintiffs have sufficiently established the

first element of contract breach—the existence of a contract between the parties.

Plaintiffs also allege that, under the "Disclosures" provision in the "Representations and

Warranties of Seller" section of the APA, Defendants agreed "to provide a litany of disclosures

relating to the Dealerships and represented and warranted that the information disclosed would

not 'contain any untrue statement of a material fact or omi[t] or shall omit to state a material fact

necessary to make the statements contained therein not misleading.'" Compl. at ¶¶ 31, 58.

Plaintiffs assert that Defendants "materially breached" their contractual obligation to Plaintiffs

under this section, by "falsely representing that Nucar had to add pack monies to the

Dealerships' reported income figures in order to understand their true financial status," when

"[i]n fact, the pack monies had already been accounted for in income." *Id.* at ¶ 62. Defendants

respond that Plaintiffs' allegations fall short of showing that that they actually breached a

contractual duty, because "[n]one of the representations or warranties made by Defendants in

Section 8 of the APA, nor any of the exhibits, schedules, disclosure statements, or certificates

Defendants were required to deliver to Plaintiffs pursuant to the APA, dealt with, involved, or

referenced pack monies." Def. Br. at 18.

The Court reiterates that, at the motion to dismiss stage, it must "accept all factual

allegations as true [and] construe the complaint in the light most favorable to the plaintiff."

*Phillips*, 515 F.3d at 233. With this in mind, the Court notes that several of Plaintiffs allegations

describe communications received from Defendants, which were made pursuant to the APA and

discuss pack monies. Plaintiffs have alleged that, during the due diligence period following the

---

[7]     The page numbers used in reference to Defendants' Brief shall refer to the page numbers assigned by Defendants' counsel on the document itself and featured at the bottom of each page, not the page numbering assigned by the ECF docketing system.

execution of the APA, Defendants not only provided Plaintiffs with an "Inventory Pack Listing" that "detailed all the pack monies that Rothrock utilized and how and where they were reflected in the Dealerships' financial statements," Compl. at ¶ 35, and provided Plaintiffs with a spreadsheet entitled "Vehicle Packs" that "indicated that the pack monies were taken into income in a 13th month statement," *id.* at ¶ 38, but also "repeatedly" confirmed to Plaintiffs "that the pack monies must be added back to adjusted net income figures provided to Nucar to understand the 'true' income and profit of the Dealerships," *id.* at ¶ 37. Thus, Defendants' argument—that none of the financial information delivered to Plaintiffs "pursuant to the APA" involved or referenced pack monies—is unavailing. Defendants may be correct that no representations, warranties, or other statements made *in the APA* involved an untrue statement of fact about pack monies, but they overlook Plaintiffs' allegations that there were statements made *pursuant to the APA* that did. In any case, to the extent the parties dispute certain facts, it is inappropriate for the Court to make a factual determination at this stage. Plaintiffs have alleged that Defendants breached the "Representations and Warranties" section of the APA, and that Plaintiffs suffered millions of dollars in losses as a result. While the specificity of damages and causation may require greater proof at a later stage in litigation, Plaintiffs have met their initial pleading burden as to the breach of contract claim. The Motion to Dismiss Count II of the Complaint will be denied.

### B.    Fraudulent Misrepresentation, Concealment, or Nondisclosure

To avoid dismissal of the fraud claims, Plaintiffs would have to plead all six of the following elements: (1) misrepresentation or concealment by Defendants; (2) materiality; (3) Defendants' knowledge or reckless disregard of falsity; (4) intention to mislead; (5) justifiable reliance by Plaintiffs; and (6) resultant injuries, *see SodexoMAGIC*, 24 F.4th at 205, and would

have to do so with particularity, *see* Fed. R. Civ. P. 9(b). The Complaint alleges that, by misrepresenting how pack monies were accounted for in the Dealerships' financials, Defendants misled Plaintiffs into overcounting the pack monies in the Dealerships' revenue, Compl. at ¶ 42, thereby leading Plaintiffs to have "a grossly inflated and inaccurate understanding of the income and profits for the Dealerships," *id.* at ¶ 44. Plaintiffs allege that a proper valuation of the Dealerships was material to the transaction, and that they would not have entered into the APA and PSA if not for these financial misrepresentations or omissions on which they relied. *See id.* at ¶¶ 45-47, 77, 89, 103. Plaintiffs further allege that Defendants "knew [they] had made repeated representations that were materially misleading," *id.* at ¶ 99, and "knew that [their] practices and instruction to Plaintiffs . . . grossly distorted the Dealerships' reported net income and overall financial picture," *id.* at ¶ 100. Lastly, Plaintiffs assert that Defendants "intended for Plaintiffs to rely upon" these misrepresentations or omissions, *id.* at ¶ 31, and that Plaintiffs "suffered losses in an estimated amount over seven figures" as a direct result of such reliance. *Id.* at ¶ 77; *see id.* at ¶¶ 89, 103.

The Court finds that Plaintiffs have "state[d] with particularity the circumstances constituting fraud," as required under Federal Rule of Civil Procedure 9(b). *See Bennett v. Itochu Int'l, Inc.*, 682 F. Supp. 2d 469, 479–80 (E.D. Pa. 2010) ("The Third Circuit Court of Appeals has interpreted Rule 9(b) to require the plaintiff to plead either the date, place or time of the fraud or through alternative means give precision and some measure of substantiation to its allegations of fraud.") (citing *Lum v. Bank of America*, 361 F.3d 217, 224 (3d Cir. 2004), *abrogated on other grounds by, Twombly*, 550 U.S. 544). Plaintiffs offer specific dates on which certain representations were made by Defendants: on February 13, 2024, Plaintiffs were provided with an "Inventory Pack Listing" which detailed the utilization and accounting for pack monies,

*id.* at ¶ 35; on February 18, 2024, they were informed that pack adjustments were "added to the cost of the vehicles and set up as liabilities on the balance sheet," and that "pack adjustments add back[s]" are "adjusted into income in the 13th month each year for tax reporting purposes"; *id.* at ¶ 36; on February 27, 2024, Plaintiffs were given a spreadsheet titled "Vehicle Packs" which "detailed all vehicle packs that Rothrock had used since 2022," *id.* at ¶ 38; and on March 11, 2024, it was confirmed that Plaintiffs needed to add the pack monies to the adjusted net income data to have an accurate picture of the Dealerships' income for a given year, *id.* at ¶ 39. Plaintiffs also allege that most of these communications came from David Rothrock. *See, e.g.*, *id.* at ¶¶ 36, 39. These allegations are sufficiently particularized for Rule 9(b) purposes.

As for the fraud elements themselves, the Court finds that the Complaint adequately pleads five of the six basic elements of fraud: misrepresentation or concealment; materiality; knowledge of falsity; intent to defraud; and resultant injury. *See SodexoMAGIC*, 24 F.4th at 205 (listing the six elements of fraud). The element of justifiable reliance, however, warrants further consideration. "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." *Lavecchia v. Fleming*, 669 F. Supp. 3d 342, 348 (E.D. Pa. 2023) (quoting Restatement (Second) of Torts, § 540), *aff'd*, No. 23-1322, 2023 WL 8469764 (3d Cir. Dec. 7, 2023); *see also Bennett*, 682 F. Supp. 2d at 479 ("The recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely.") (citing *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 207 (Pa. 2007)). However, the recipient "is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." *Lavecchia*, 669 F. Supp. 3d at 348 (quoting Restatement (Second) of Torts, § 541). Under Pennsylvania law, where an integrated contract has a "fraud-insulating clause," *i.e.*, one in which

the parties "expressly disclaim[] reliance on [each other]'s precontractual representations," or "state that the representations in the contract either supersede all prior representations . . . or are the only representations made," the parol evidence rule prevents a party from saying he "justifiably relied on prior representations that he has superseded and disclaimed." *SodexoMAGIC*, 24 F.4th at 215 ("Pennsylvania's parol evidence rule does not prevent fraudulent inducement claims for all integrated contracts, but the rule may preclude such claims based on misrepresentations for 'integration-plus' contracts – integrated contracts with fraud-insulating provisions."). Here, Defendants argue that the Court should find that Plaintiffs' reliance on any misrepresentations or omissions was not justified, given their "sophistication and experience in the relevant industry," Def. Br. at 27, and given Pennsylvania's parol evidence rule, *id.* at 25. In making this argument, Defendants assert that the APA and the PSA are integrated documents, and that the APA has a fraud-insulating provision. *See id.* at 11. The Court agrees.

None of the parties to this case argue that the APA or the PSA were not the complete and final agreements between them for the purchase of the Dealerships and related real estate. Rather, Section 30 of the APA, titled "Entire Agreement," states that "[t]his Agreement . . . and the documents delivered pursuant hereto, are intended by the parties as a final expression of their understanding and/or a complete and exclusive statement of the terms and conditions concerning the subject matter hereof." APA § 30. The inclusion of this language, and the parties' execution of the APA on January 29, 2024, further confirm that the parties intended the APA to be a fully integrated document. Moreover, Section 30 of the APA also indicates that "[t]his Agreement . . . supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether written or oral, of the parties; and there are no representations, warranties,

or other agreements between the parties in connection with the subject matter hereof, except as specifically set forth herein or therein." *See id.* By explicitly affirming that the APA "supersedes" all prior understandings and discussions, and stating that there are no other representations between the parties except those outlined in the APA, the parties have created a fraud-insulating provision. *See SodexoMAGIC*, 24 F.4th at 215. By consenting to the inclusion of this clause, both sides affirm their intent to be bound by only the representations in the APA, and Plaintiffs are barred from arguing justifiable reliance on misrepresentations not featured in the integrated document. *See id.* Without establishing justifiable reliance, Plaintiffs cannot plead a necessary element of their fraud claims. Accordingly, the claims for fraudulent misrepresentation, concealment, and nondisclosure must be dismissed.[8] Counts IV, V, and VI will be dismissed without prejudice. *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that "if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile"), *abrogated on other grounds by*, *Iqbal*, 556 U.S. at 678.

### C.    Requested Relief

#### i.    Rescission

Plaintiffs plead "rescission" as a separate cause of action, however, "[r]escission is not a claim for relief or a cause of action, but rather it is an equitable remedy within a court's discretion." *Atlantic Holdings, Ltd. v. Apollo Metals, Ltd.*, 263 F. Supp. 3d 526, 532 (E.D. Pa. 2017) (citing *Therien v. Trustees of Univ. of Penn.*, No. 04-cv-4786, 2006 WL 83448, at *3 (E.D.

---

[8]      Because Plaintiffs have failed to demonstrate fraud, the Court will not endeavor to determine whether Plaintiffs have also demonstrated a special relationship or duty between the parties, as also required to plead fraudulent concealment or nondisclosure. Plaintiff counsel is notified that, should an amended complaint be filed, these additional pleading requirements must be met.

Pa. Jan. 10, 2006); *Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.*, 94 F. Supp. 2d 589,

595 (E.D. Pa. 1999)). "Rescission is the unmaking or annulment of a contract." *Kapotas v. CTP*

*Funding, LLC*, No. 2:24-cv-01995, 2025 WL 2250003, at *10 (E.D. Pa. Aug. 6, 2025) (quoting

*Lavecchia*, 669 F. Supp. 3d at 347). Thus, it may be sought as a remedy for an underlying cause

of action, but not as a standalone claim.[9] Accordingly, the Court will dismiss Count I with

---

[9]        Plaintiffs, in their response to the Motion to Dismiss, assert that "rescission based on
fraud" is a valid cause of action under Pennsylvania law. Pl. Br., ECF No. 22, at 14. In support,
they quote several inapposite cases which they purport lend support for the fact that "rescission
. . . based on fraud" is an independent cause of action. For example, Plaintiffs quote *Moffatt
Enterprises, Inc. v. Borden, Inc.*, for the proposition that "[u]nder Pennyvania law, a defrauded
party may pursue several remedies including an action of damages for deceit, recission [sic] and
restitution based on fraud, and reformation of the contract for fraud." 807 F.2d 1169, 1174 (3d
Cir. 1986). In doing so, Plaintiffs bold the words "action" and "recission . . . based on fraud,"
seemingly to show that the Third Circuit intended to highlight "rescission" as a right of action all
its own. This is not so. The *Moffatt* case featured an appeal of summary judgment granted in
favor of a manufacturer that was sued by its distributors for fraud, misrepresentation, breach of
fiduciary duty, strict liability, breach of warranties, and wrongful termination. *See id.* The
underlying complaint in *Moffatt* did not feature a rescission claim, let alone one "based on
fraud." *See id.* In its opinion, the *Moffatt* court recapped the elements of fraudulent and negligent
misrepresentation claims and discussed available remedies for defrauded parties before
ultimately reversing and remanding to the district court. *See id.* at 1174-76. Plaintiffs' reliance on
the above quote is misguided, and the quote is taken out of context—the paragraph from which it
was pulled discussed the potential remedies a defrauded party may pursue when fraud claims are
brought. A proper reading of the quote reveals the overlooked word "remedies," and (though a
colon might have improved readability) reveals a list: "[u]nder Pennsylvania law, a defrauded
party may pursue several **remedies[,]** including**[:]** an action of **damages** for deceit, **recission**
[sic] **and restitution** based on fraud, and **reformation** of the contract based on fraud." *Id.* at
1174 (bolding and conventions added for illustrative purposes). The Court reads this quote as
providing a list of available remedies (money damages, recission, restitution, and reformation),
which a defrauded party may pursue *in connection with* underlying causes of action that sound in
tort (*i.e.*, deceit, fraud). *See id.* (citing 12 S. Williston, A Treatise on the Law of Contracts
§§ 1523–1525A (3d ed. 1970 & Supp. 1986) which "discuss[es] remedies available to defrauded
parties," and E.A. Farnsworth, Contracts, § 4.15 (1982), which "discuss[es] the effects of and
remedies for misrepresentation").
        Plaintiffs also quote *Gamesa Energy USA, LLC v. Ten Penn Ctr. Assocs.*, for the
proposition that Pennsylvania law has validated a party's right to "simultaneously plead and
attempt to prove alternative causes of action" including  "alternative claims seeking the
inconsistent remedies of damages for breach of contract and for termination/rescission" of an
agreement. 217 A.3d 1227, 1239 (Pa. 2019). In doing so, Plaintiffs bold the words "alternative
claims" and "termination/rescission," seemingly to suggest that the Supreme Court of

prejudice for failing to state a claim recognized by Pennsylvania (or Federal) law, since amendment of a nonexistent claim would be futile. *See Alston*, 363 F.3d at 235.

    To the extent Plaintiffs seek rescission as an equitable remedy in conjunction with another cause of action, however, Pennsylvania law requires they establish that "(1) the opposing party made a material misrepresentation, whether or not the opposing party was aware of the falsehood; (2) the party seeking rescission justifiably relied on the misrepresentation; and (3) the parties can be restored as nearly as possible to their original positions" with respect to the contract. *Lavecchia v. Fleming*, 668 F. Supp. 3d, 335, 336 (E.D. Pa. 2023) (denying motion to alter or amend judgment of court in *Lavecchia*, 669 F. Supp. 3d 342); *see Kapotas*, 2025 WL 2250003, at *10 (citing *Lavecchia*, 669 F. Supp. 3d at 348). "Unlike a claim of breach of contract seeking money damages, rescission comes into play only when a party is attacking the validity of the agreement, that is, challenging whether there was ever a meeting of the minds." *Coram*, 94 F. Supp. 2d at 596. Importantly, Pennsylvania law also requires "prompt action [as] a prerequisite to the remedy of rescission." *Lavecchia v. Fleming*, No. 23-1322, 2023 WL 8469764, at *1 (3d Cir. Dec. 7, 2023) (internal citations omitted). "A court's focus, therefore, must be on whether the buyers' conduct timely affirms or disaffirms the contract." *Id.* "A party to a contract who has been defrauded may seek rescission of the contract as a remedy," *Atlantic Holdings*, 263 F.

---

Pennsylvania deemed rescission an independent cause of action. Again, Plaintiffs' accentuation misses the mark, and misunderstands the court's meaning. *Gamesa Energy* featured a landlord-tenant dispute, in which the plaintiff brought claims for breach of contract, tortious interference in business relationships, and unjust enrichment. *See id.* at 1230. The case did not involve a claim for rescission, and instead, the opinion repeatedly refers to rescission as a "remedy." *See id.* at 1237, 1239, 1240. Again, Plaintiffs overlook the word "remedies," which should instead be emphasized, because the paragraph from which it was pulled discusses a plaintiff's ability to pursue "alternative claims" which *seek* "the inconsistent **remedies** of **damages** for breach of contract and for **termination/rescission** of the Lease." *Id.* at 1239 (bolding added for illustrative purposes). Here, as before, rescission was used to provide an example of one such remedy. Thus, Plaintiffs' argument—that a rescission claim is a valid, independent cause of action—fails.

Supp. 3d at 532, so long as they show that the parties "can be restored to their original positions with regard to the subject matter of the contract." *Learnquest, Inc. v. Alchemy Software Sols., Inc.*, No. 2:20-cv-02309, 2021 WL 4192044, at *5 (E.D. Pa. Sept. 14, 2021) (quoting *Harold ex rel. Harold v. McGann*, 406 F. Supp. 2d 562, 575 (E.D. Pa. 2005)); *see Lavecchia*, 668 F. Supp. 3d at 337 (denying motion to alter or amend judgment of court in *Lavecchia*, 669 F. Supp. 3d 342) (Rescission is "available only when it is possible to restore the status quo ante.").

Here, Defendants correctly argue that Plaintiffs are barred by the Pennsylvania parol evidence rule from seeking the remedy of recission in connection with a fraudulent inducement claim. *See Coram*, 94 F. Supp. 2d at 594-95 (explaining that, under Pennsylvania law, recission is not available as a remedy when sought based on fraudulent inducement, a claim barred by the Pennsylvania parol evidence rule). To the extent the remedy of recission is sought in connection with another of Plaintiffs' claims, it is available only as relief for fraud, not breach of contract. *See Umbelina v. Adams*, 34 A.3d 151, 158 (Pa. Super. Ct. 2011) (finding that rescission of a contract was not permitted in the event of a material breach, but only in the event of "fraud, mistake, failure of consideration, and quia timet") (internal citations omitted). The Court, however, has dismissed Plaintiffs' fraud claims, *See* section IV(B), *supra*, thereby rendering rescission inapplicable as a remedy. The Court will therefore refrain from discussing its availability further, except to say that Plaintiffs may request recission as a remedy for an amended fraud claim in a later pleading.

### ii.  Indemnification

Plaintiffs also plead "indemnification" as a separate cause of action, but they reference the indemnification provision of the parties' Asset Purchase Agreement ("APA"), which obligates Defendants to "indemnify and hold harmless" Plaintiffs against and from all losses

"incurred as a result of Rothrock's breaches." *See* Compl. at ¶ 66. The Court reads this as a request for contractual indemnification in the event the Court finds Defendants liable for contract breach or fraud.[10]  Plaintiffs request indemnification "in the alternative to [r]ecission," and so the Court will consider the availability of indemnification as a contractual remedy.

Contract indemnification presents when "there is an express contract to indemnify" between the parties. *Kerrigan v. Villei*, 22 F. Supp. 2d 419, 426 (E.D. Pa. 1998) (quoting *Richardson v. John F. Kennedy Memorial Hospital,* 838 F. Supp. 979, 989 (E.D. Pa. 1993) (applying Pennsylvania law)). An indemnification provision in a contract "holds the indemnitee harmless from liability by requiring the indemnitor to bear the cost of any damages for which the indemnitee is held liable." *Roubert v. Amazon*, No. 21-cv-3091, 2025 WL 3062732, at *5 (E.D. Pa. Nov. 3, 2025) (citing *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 202 (3d Cir. 1995))[11]; *see also Sunoco (R&M), LLC v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, 322 A.3d 930,

---

[10]    Plaintiffs make clear in their Complaint that they seek contractual indemnification, *see* Compl. at ¶¶ 66-67 (seeking indemnification for losses "as defined in the APA" and incurred as a result of Defendants "breaches of its representations and warranties" stated in the APA), as opposed to common-law indemnification, under Pennsylvania law. By contrast to contractual indemnification, common law indemnification is an "equitable remedy that shifts the entire responsibility for damages from a party who, without any fault, has been required to pay because of a legal relationship to the party at fault." *City of Wilkes-Barre v. Kaminski Bros.*, 804 A.2d 89, 92 (Pa. Commw. Ct. 2002) (citing 18 P.L.E. *Indemnity* § 2 (1988); Restatement (Second) of Torts § 886B (1979)). "It is a fault-shifting mechanism that comes into play when a defendant held liable by operation of law seeks to recover from a defendant whose conduct actually caused the loss." *Id.* Notwithstanding, Pennsylvania case law suggests that in the event Plaintiffs sought relief through both forms of indemnity, the parties' contract (the APA) would govern, and its contractual indemnification clause would preclude any common-law indemnification sought. *See Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare*, 299 A.3d 937, 977 (Pa. Super. Ct. 2023), *reargument denied* (Sept. 6, 2023), *reargument denied* (Sept. 13, 2023).

[11]    "Generally, an indemnity agreement also includes a 'hold harmless' clause by which the indemnitor agrees 'to indemnify and hold harmless' the indemnitee. A hold harmless agreement is 'A contractual arrangement whereby one party assumes the liability inherent in the undertaking, thereby relieving the other party of the responsibility.'" *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 202 n.6 (3d Cir. 1995) (citing Black's Law Dictionary 658 (5th ed. 1979)).

951 (Pa. Super. Ct. 2024), *reargument dismissed* (Sept. 3, 2024), *appeal denied*, 333 A.3d 1039

(Pa. 2025) ("[a]n agreement to indemnify is an obligation resting upon one person to make good

a loss which another has incurred or may incur by acting at the request of the former, or for the

former's benefit") (citing *Burlington Coat Factory of Pennsylvania, LLC v. Grace Constr. Mgmt.*

*Co., LLC*, 126 A.3d 1010, 1022 (Pa. Super. Ct. 2015) (*en banc*)). In short, the plain meaning of

"indemnify" is "to compensate." *See Dansko Holdings, Inc. v. Benefit Tr. Co.*, 991 F.3d 494, 502

(3d Cir. 2021), *as revised* (Mar. 25, 2021) (citing *Atari Corp. v. Ernst & Whinney*, 981 F.2d

1025, 1032 (9th Cir. 1992) (quoting Black's Law Dictionary 769 (6th ed. 1990)); *see also*

*Indemnify, Black's Law Dictionary* (12th ed. 2024) ("To reimburse (another) for a loss suffered

because of a third party's or one's own act or default")).

"The construction of an indemnity contract is a question of law for the court to decide."

*Ogontz Fire Co. v. Township*, No. 23-cv-569, 2025 WL 2004692, at *3 (E.D. Pa. July 17, 2025)

(citing *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)). Under Pennsylvania

law,[12] a court considering the construction and enforceability of an indemnification provision

"must strictly construe the scope of [the contract] against the party seeking indemnification." *Id.*

(quoting *Jacobs Constructors, Inc. v. NPS Energy Services, Inc.*, 264 F.3d 365, 371 (3d Cir.

2001)). "Indemnity clauses in contracts are to be interpreted in accordance with the general rules

governing contract law." *Kerrigan*, 22 F. Supp. 2d at 426. When interpreting the scope of such a

---

[12]    There are many stringent standards around indemnity clauses because they are generally
disfavored under Pennsylvania law. *Id.* at 202; *see John Spearly Const., Inc. v. Penns Valley
Area Sch. Dist.*, 121 A.3d 593, 604 (Pa. Commw. Ct. 2015). An indemnity provision can be
enforceable, however, if it (1) does not contravene public policy; (2) relates only to the
contracting parties while excluding matters of public interest; (3) results from the equal
bargaining power of both parties; and, in the event a party seeks to contract away responsibility
for its own negligence, (4) clearly states that the beneficiary is relieved of liability only for the
beneficiary's own negligence. *See Valhal Corp.*, 44 F.3d at 202.

clause, "the court must consider the four corners of the document and its surrounding circumstances." *Burlington Coat Factory*, 126 A.3d at 1022 (quoting *Widmer Engineering v. Dufalla,* 837 A.2d 459, 472 (Pa. Super. Ct. 2003), *appeal denied,* 852 A.2d 313 (Pa. 2004)). "Express indemnity contracts are construed 'to effectuate the contracting parties' intent as manifested from the contract's plain language and in light of the situation of the parties and the circumstances connected with the transaction.'" *Kerrigan*, 22 F. Supp. 2d at 426 (quoting *Richardson*, 838 F. Supp. at 989 (applying Pennsylvania law)). They should be "narrowly interpreted in light of the parties' intentions as evidenced by the entire contract." *Cottman Ave. PRP Grp., et al. v. AMEC Foster Wheeler Env't Infrastructure Inc.*, 439 F. Supp. 3d 407, 438 (E.D. Pa. 2020) (quoting *Consolidated Rail Corp. v. Delaware River Port. Auth.,* 880 A.2d 628, 632 (Pa. Super. Ct. 2005), *appeal denied,* 898 A.2d 1071 (2006)); *Burlington Coat Factory*, 126 A.3d at 1022.

To establish a right to indemnification, the indemnitee must establish the scope of the indemnification agreement, the nature of the underlying claim, and whether the claim fell within the scope of the indemnification agreement. *Sunoco*, 322 A.3d at 951. The indemnitee must also establish the reasonableness of the alleged expenses, whether the underlying action is settled versus resolved by a judgment, the validity of the underlying claim, and the reasonableness of any settlement. *Burlington Coat Factory*, 126 A.3d at 1022 (citing *McClure v. Deerland Corp.*, 585 A.2d 19, 22 (Pa. Super. Ct. 1991)). Importantly, "unless a loss has actually been incurred, an indemnity claim for that loss is premature."[13] *See Ogontz*, 2025 WL 2004692, at *5 (quoting *Key*

---

[13]     Courts engaging in indemnification discussions also consider whether the indemnitee suffered a loss that required it make a payment to a third party. Pennsylvania law requires the indemnitee pay, or be obligated to pay, money to a third party *in order for* the right to indemnification to arise. *See F.J. Schindler Equipment Co. v. Raymond Co.*, 418 A.2d 533, 534 (Pa. Super. Ct. 1980) ("It is clear that before the right of indemnification arises, the indemnitor

*Star Partners, LLC v. Insignia Disposal Servs., LLC*, No. 22-cv-2338, 2023 WL 2920283, at *7

(E.D. Pa. Apr. 12, 2023)); *see also F.J. Schindler Equipment Co. v. Raymond Co.*, 418 A.2d 533,

534 (Pa. Super. Ct. 1980) (finding that an action for indemnification brought before the payment

of a judgment or settlement was premature)). "Under Pennsylvania law, actual payment, and not

just a verdict or judgment, is required," *Key Star Partners*, 2023 WL 2920283, at *7, however

the "mere expenditure of counsel fees" does not satisfy the payment requirement for contractual

indemnification. *Ogontz*, 2025 WL 2004692, at *5 (internal citations omitted).

Here, Plaintiffs make clear that there is an express indemnification agreement by citing

directly to the "Indemnification" provision of the APA. *See* Compl. at ¶ 66; APA § 17.

Defendants, however, argue that Plaintiffs' underlying causes of action fall outside the scope of

this provision. Defendants assert that the allegations in the Complaint relate to "extra-contractual

statements, conversations, and disclosures that are not provided for in and excluded from any

representation, warranty, covenant, exhibit, certificate, or disclosure made pursuant to the APA

or the PSA." Def. Br. at 22. To the extent Plaintiffs seek indemnification on their fraud claims,

---

must in fact pay damages to a third party. Any action for indemnification before such payment, as in the present case, is premature."). Courts within the Third Circuit consistently reiterate this requirement. *See, e.g., Ogontz Fire Co. v. Township*, No. 23-cv-569, 2025 WL 2004692, at *3-4 (E.D. Pa. July 17, 2025) (quoting *F.J. Schindler,* 418 A.2d at 534); *Key Star Partners, LLC v. Insignia Disposal Servs., LLC*, No. 22-cv-2338, 2023 WL 2920283, at *7–8 (E.D. Pa. Apr. 12, 2023) (same); *Kerrigan v. Villei*, 22 F. Supp. 2d 419, 426–27 (E.D. Pa. 1998) (same). In recent years, the Third Circuit has clarified that a right to indemnification means entitlement to compensation for losses paid by the indemnitee *to* a third party, but not necessarily for losses *caused by* a third party. *See Dansko Holdings, Inc. v. Benefit Tr. Co.*, 991 F.3d 494, 502 (3d Cir. 2021), *as revised* (Mar. 25, 2021). In essence, a standard indemnification provision will often provide one party with indemnification rights in the event of the other party's breach or another defined event, *if* that breach caused the former party to suffer losses in the form of mitigation, legal costs, or other expenses requiring the payment of money to third parties. *See Ogontz*, 2025 WL 2004692, at *5 ("Under Pennsylvania law, unless a loss has actually been incurred, an indemnity claim for that loss is premature") (internal quotation omitted); *see also Cottman Ave. PRP Grp., et al. v. AMEC Foster Wheeler Env't Infrastructure Inc.*, 439 F. Supp. 3d 407, 437-38 (E.D. Pa. 2020) (engaging in contractual interpretation of indemnification clause language).

the Court has since dismissed them, so indemnification is inapplicable. Yet, to the extent that Plaintiffs seek indemnification on the breach of contract claim, the indemnification provision of the APA reads, in pertinent part, that "Seller" shall:

> indemnify, defend and hold harmless Buyer from and against any and all claims, losses, damages, debts, obligations and liabilities, including reasonable attorneys' fees and disbursements (collectively, "Losses"), based upon, incurred in connection with, arising out of or otherwise in respect of any . . . breach or failure of, any representation or warranty of Seller [. . . .]

APA § 17.1. Thus, where Plaintiffs' breach of contract claim relates to Defendants' representations and warranties in the APA—the exact language included in the indemnification provision—it is hard to see how this underlying cause of action falls outside of the scope of the indemnification provision, rather than squarely within it.

Defendants also argue that Plaintiffs' request for indemnification is premature, but Plaintiffs have alleged losses already incurred, including "overpayment[,] . . . the transactional costs associated with entering into and closing on the APA and [PSA], losses incurred in the operation of the Dealerships and related real estate post-closing of the APA, and the costs and expenses associated with investigating and addressing Rothrock's breaches," including "forensic investigation fees and costs and attorneys' fees and costs." Compl. ¶ 67. Because Plaintiffs allege that these expenses were already paid, the Court has no reason to find that indemnification is unavailable. As for the amount and reasonableness of Plaintiffs' alleged expenses, including attorney's fees, the Court need not engage in that discussion now. Prior to the rendering of a final judgment on the underlying cause of action, any such calculation would be premature. Without an underlying cause of action, though, indemnification would not stand alone, hence amendment of the indemnification claim would be futile. *See Alston*, 363 F.3d at 235. Thus, as with Count I,

the Court will also dismiss Count III with prejudice to the extent it is pleaded as an independent cause of action.[14]

## V.     CONCLUSION

Plaintiffs have met their initial pleading burden with respect to their breach of contract claim, but have failed to meet the pleading requirements for fraud. Plaintiffs have also pleaded claims which are more appropriately sought as forms of relief. The Motion to Dismiss is therefore denied as to Count II (breach of contract), and granted as to the remaining counts, as follows: Counts I and III (rescission and indemnification) will be dismissed with prejudice; Counts IV, V, and VI (fraudulent misrepresentation, concealment, and nondisclosure) will be dismissed without prejudice. Plaintiffs will be granted leave to amend their complaint in accordance with the Court's reasoning herein.

A separate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

---

[14]     Plaintiffs may still seek rescission, or alternatively, indemnification, through the breach of contract or fraud claims in their amended complaint, insofar as they can establish these underlying causes of action.